UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MICHAEL D.,
    Plaintiff,

v.                                         C.A. No. 19-157JJM

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL SECURITY,
    Defendant.

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Before the Court is the motion of Plaintiff Michael D. for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff contends that the administrative law judge ("ALJ") erred (1) in rejecting the opinion of the testifying medical expert ("ME"), psychologist Dr. Norman Baldwin, who opined that one of Plaintiff's mental health impairments (personality disorder with antisocial features) meets or equals the criteria for Listing 12.08 ("personality and impulse-control disorders"); and (2) in relying instead on the state agency psychologist and psychiatrist whose file review was largely based on medical evidence developed prior to the period in issue. Defendant Andrew M. Saul ("Defendant") has filed a counter motion for an order affirming the Commissioner's decision.

The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find that Plaintiff's amendment of his date of alleged onset of disability to May 19, 2017, coupled with the ALJ's erroneous finding that "mental status examinations have generally been within normal

limits," Tr. 32, among other errors, left the ALJ without substantial evidence to buttress the Step Three findings on which he relied to reject Dr. Baldwin's testimony that one of Plaintiff's impairments meets or equals Listing 12.08. Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 11) be GRANTED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be DENIED.

## I.     **Background**[1]

A "younger person" in Social Security parlance throughout the period in issue, Plaintiff's education ended after he completed the sixth grade having stayed back for four years; during childhood he was hospitalized at least once for mental health issues at Bradley Hospital. Tr. 405-12, 425-27. His adult life has been punctuated by short periods of incarceration, with extended periods of no income at all (2002 to 2008) and other periods (2009 to 2015) of earning $9,000 to $15,000 working as a laborer doing demolition and hanging sheet rock. Tr. 45-50, 290-91. Plaintiff has eight children by three women and, prior to achieving sobriety in August 2016, repeatedly engaged in violent conduct resulting in the entry of no-contact orders barring him from interacting with the mothers of his children, with some of the children, and with other family members. Tr. 409. Plaintiff's SSI/DIB applications initially alleged onset of disability on January 1, 2016; however, on the day of the ALJ hearing, he amended the alleged date of onset to May 19, 2017.

*Treatment During Pre-File Review Period*

The treating record in the case begins in the aftermath of an incarceration in the summer and fall of 2016. As required by his probation conditions, Plaintiff initiated mental

---

[1] During the administrative phase of these applications, Plaintiff asserted several physical impairments, including an elbow condition and difficulties with his legs, which the ALJ properly incorporated into his residual functional capacity finding. These are not in issue before this Court.

health/substance abuse treatment with the Providence Center in October 2016. Tr. 405. Until the end of probation in February 2017, he was seen by a qualified mental health professional, Laura Amaral, and successfully completed the treatment program. Tr. 413-17. He continued to see Ms. Amaral through August 2017. Tr. 431-35. Her treating notes reflect that he was working until his amended onset date, e.g., Tr. 415 (in December 2016, "continuing to . . . work"); however, in February 2017, she noted that he was "continuing to have issues with his boss," Tr. 431, and then, on May 10, 2017 (just days before the amended onset date), that "he believes he lost his job as his boss has not responded to him." Tr. 434. As the amended onset date approached, Ms. Amaral's mental status examination ("MSE") observations grew worse; to illustrate, her MSE from December 14, 2016, was largely within normal limits, Tr. 415, but by April 6, 2017, she recorded MSE observations of constricted affect, agitated behavior, depressed/anxious mood, rapid speech, racing thoughts, sleep disturbance, decreased energy, and difficulty paying attention. Tr. 433. Her MSE for May 10, 2017, is somewhat better but still abnormal. Tr. 434 ("Mood: anxious").

On February 2, 2017, Plaintiff was seen for the first time by a Providence Center psychiatrist, Dr. Omer Cermik. Tr. 428. At his initial encounter, Dr. Cermik diagnosed major depressive disorder, post-traumatic stress disorder ("PTSD"), personality disorder with antisocial features and substance abuse in remission. Tr. 429. Dr. Cermik's initial MSE observations included many that were abnormal, including "Affect: restricted and irritable," "Mood: dysphoric upset," "Thought Process: linear, but appears superficial," "Fund of Knowledge: below average," "(+) sleep disturbance," and "Reports reduced appetite and energy level." Tr. 428. Dr. Cermik increased the dose of Seroquel and prescribed an antidepressant. Id. On April 6, 2017, Dr. Cermik performed an extensive psychiatric evaluation of Plaintiff; based on the

evaluation, he added intellectual disability to the list of diagnosed impairments. Tr. 426. His second MSE included the same abnormal observations he had made during the first MSE, but he also observed "low frustration tolerance," "gets upset quickly," and "denies auditory hallucinations but reports seeing things at times." Id. As part of his MSE observations, Dr. Cermik recorded Plaintiff's statement that "I am always aggravated; yelling at people." Id. On June 21, 2017, Dr. Cermik saw him again; the third MSE is also abnormal, with essentially the same observations as the second. Tr. 461-62.

*State Agency File Review and Opinions*

The records described above were assembled to be presented to the state agency expert file-reviewers (psychiatrist Dr. Susan Killenberg at the initial phase and psychologist Dr. Clifford Gordon at reconsideration). As of the time of presentation, Plaintiff was still alleging that he had been disabled since January 1, 2016, even though there was no treatment until October 2016 and there was reported income during 2016. The file reviewed for the initial phase by Dr. Killenberg ended with Dr. Cermik's first diagnostic encounter with Plaintiff. For most of the relevant period pertinent to her examination, there was no evidence of any mental health treatment. Significantly, Dr. Killenberg reviewed Ms. Amaral's treating notes, for example from December 14, 2016, which mention that Plaintiff was working. E.g., Tr. 415. Dr. Killenberg did not see Ms. Amaral's subsequent notes recording that Plaintiff had "issues with his boss," and lost the job a few weeks later. See Tr. 431, 434.

In addition to what Dr. Killenberg saw, Dr. Gordon saw the records of Dr. Cermik's second and third encounters, which added the diagnosis of intellectual disability and reflect more abnormal MSE findings, despite an extra four months of treatment with Ms. Amaral. Dr. Gordon also saw the notes reflecting Ms. Amaral's appointments during those four months when

Plaintiff seemed to be worsening, including losing a job because of "issues with his boss," Tr. 431. Nevertheless, Dr. Gordon adopted without change Dr. Killenberg's explanation that her opinion was based on Plaintiff "doing some work," Tr. 116, essentially copying verbatim the findings made by Dr. Killenberg. Dr. Gordon's only original contribution is his observation that Dr. Cermik did not perform cognitive testing, yet found intellectual disability;[2] Dr. Gordon notes that earlier testing (from 2012) placed Plaintiff cognitively in the borderline zone, that is, on the cusp of intellectual disability. Tr. 141, 155.

Supported by their finding that Plaintiff was "probably working" into 2017, Tr. 143 ("Prov Ctr therapy notes suggest that clmt is doing some work"), the state agency experts agreed that Plaintiff had only mild deficiencies with understanding and memory and moderate deficiencies with the ability to attend, to adapt to change, and to relate to others. In reliance on these conclusions, they each formulated an identical residual functional capacity ("RFC"),[3] opining that Plaintiff is able to perform simple work in a low stimulus environment with minimal interpersonal demands. Tr. 115-18, 128-31, 142-45, 156-59. Dr. Killenberg signed her opinion on April 7, 2017, and Dr. Gordon signed his on July 25, 2017.

*Treatment During Post-File Review Period*

After the completion of the state agency file reviews until a month before the ALJ hearing (August 28, 2018), Plaintiff – regularly though January 2018 and then very intermittently – continued to treat at the Providence Center with Dr. Cermik. During this period, he had his last appointment with Ms. Amaral and began counseling with a social worker, Jennifer LaForge. Tr.

---

[2] Possibly because the finding of intellectual disability did not appear in this record until after the initial phase of the case, the Commissioner did not engage an examining consultant and no testing was performed. This might be appropriate for further consideration on remand.

[3] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

5

495-501, 535-47, 647-65. Also during this period, Plaintiff failed to appear for at least one appointment with Dr. Cermik. Tr. 497. In April 2018, he was discharged by the Providence Center. Tr. 647. Then he resumed treatment at the Providence Center in July 2018. Tr. 647-65.

The substantive treatment during the post-file review period reflects abnormal MSE observations by Dr. Cermik and Ms. Amaral, but not by the social worker, Ms. LaForge.[4] Dr. Cermik's final MSE (July 16, 2018) includes the same abnormal findings from his earlier MSEs, with the additional finding of disheveled appearance – in all, Dr. Cermik performed three MSEs during the post-onset period, all of which are significantly abnormal. Tr. 655. Also in the post-file review period, is Ms. Amaral's MSE of August, 15, 2017, which reflects the continuing exacerbation of Plaintiff's symptoms since she began seeing him in the pre-file review period: "Affect: constricted; Behavior: agitated; Mood: irritable; Speech: rapid speech; Thought Process: organized, racing; Thought Content: Hallucinations: sees 'ants', people, hears dads voice..; . . . sleep disturbance 3 hours per night; decrease in appetite; decrease in energy level." Tr. 496. Ms. LaForge's final note of record (July 19, 2018) reflects Plaintiff's report of "increased symptoms related to his anger management" and "some interactions with individuals which lead him to return to treatment . . . agitation, anger and isolation"; her MSE for this appointment (for the first time) is abnormal. Tr. 662-63.

The ALJ hearing highlighted several ways in which the evidence for the post-file review period is confusing. For example, a LaForge note from January 19, 2018, reflects that Plaintiff told her he was "working full time." Tr. 535. Somewhat inconsistently, the Providence Center discharge summary (apparently prepared without renewed contact with Plaintiff) states "working part time," Tr. 647, while Plaintiff emphatically denies that he told Ms. LaForge that he was

---

[4] Of the social worker's six MSEs, only one, the last (July 9, 2018), has abnormal findings. See Tr. 662 (affect anxious, appearance older than stated age and sleep disturbance).

6

working at all and claims he emphasized that to Dr. Cermik on July 16, 2018, whose note is corroborative, "unable to work." Tr. 48, 651. The discharge summary itself is puzzling in that it appears to be based on the completion of treatment, Tr. 647-49, yet Ms. LaForge's July 2018 note indicates that the discharge was "due to noncompliance." Tr. 658. Also confusing is Plaintiff's insistence that he had appointments every two weeks with Ms. LaForge, yet the record reflects meetings approximately a month apart only in October 2017 through January 2018, after which there is a six-month gap. Tr. 68, 69-70. To explain apparent treatment noncompliance based on the paucity of appointments and resulting lapse in medication, Plaintiff testified that he avoided going to see Dr. Cermik because he believed that Dr. Cermik "put[] me down" and was trying to provoke Plaintiff to become violent. Tr. 56, 61-62.

*Amendment of Onset Date*

On the day of the ALJ hearing (August 28, 2018), Plaintiff filed the amendment of his alleged onset date, changing it from January 1, 2016, to May 19, 2017. Tr. 300. During the hearing, Plaintiff's attorney stated that Plaintiff stopped working that day because of cortisone injections he started for an elbow condition. Tr. 47. Ms. Amaral's therapy notes suggest that Plaintiff was terminated from work because of "issues with his boss." Tr. 431, 434. This amendment resulted in a profound change in what is pertinent to whether Plaintiff is disabled. Dr. Killenberg's file review-based opinion was signed on April 7, 2017 – therefore, she saw nothing from the actual period of alleged disability. And Dr. Gordon's file review was completed on July 25, 2017 – therefore, he saw only one record from the period of disability (Dr. Cermik's notes from his third encounter). And while this record is mentioned in Dr. Gordon's summary, his findings are largely copied verbatim from Dr. Killenberg.

*Medical Expert (Dr. Baldwin) Opinion*

7

Present throughout the ALJ hearing was an SSA psychologist called as a medical expert by the ALJ, Dr. Baldwin. Tr. 44. Dr. Baldwin reviewed the entire record, heard Plaintiff's testimony and then performed an extensive examination of his own, one that extended over twelve transcript pages. Tr. 65-77. During Dr. Baldwin's questioning, Plaintiff became so agitated at being asked a question he had already answered that the ALJ asked his attorney to remove him from the hearing room and summoned security. Tr. 73-74. After completing his own questions, and testifying that his opinion was to a reasonable degree of medical certainty, in reliance not only on his review of the record but also on his observations of "Claimant's presentation at the hearing today," Tr. 78, Dr. Baldwin opined that Plaintiff's personality disorder meets the criteria for Listing 12.08, which deals with personality and impulse-control disorders. POMS DI 34001.032 (Mental Disorders). In giving this opinion, Dr. Baldwin specifically acknowledged his awareness of what the ALJ characterized as the lack of evidence "for the last eight months." Tr. 78. As to the diagnosis of PTSD, Dr. Baldwin declined to opine because of the lack of evidence and "issues as far as treatment compliance." Tr. 77. Dr. Baldwin endorsed the diagnosis of mood disorder, but did not separately discuss the Listing criteria applicable to it. He did not mention the diagnosis of intellectual disability.

*ALJ Decision*

The ALJ rejected Dr. Baldwin's expert opinion at Step Three[5] and as a foundation for his RFC finding because "his testimony is not supported by the record." Tr. 28, 33. In developing this finding, the ALJ noted that "mental status examinations have generally been within normal limits." Tr. 32. He also relied on noncompliance with treatment (and improvement when

---

[5] At Step Three, the ALJ not only set out specific findings but also incorporated the findings set out in his RFC analysis. Tr. 28. Therefore, in this report and recommendation, I have reviewed the entire decision to determine whether there is substantial evidence to support its key findings and conclusions.

8

compliant), minimal medication adjustments, no hospitalizations and a report of employment as late as July 2018, as well as the opinions of the state agency experts, Drs. Killenberg and Gordon, which he afforded "great weight." Tr. 33. At Step Three in particular, the ALJ focused on Plaintiff's ability to work in the past, the lapse of Plaintiff's violence (which abated when he achieved sobriety), Plaintiff's MSE findings of adequate attention and Plaintiff's conservative outpatient treatment. Tr. 28. Importantly, the ALJ's Step Three and RFC findings are lifted virtually without change from the Killenberg/Gordon opinions, except that at Step Three, the ALJ also relied on his own observations of Plaintiff at the hearing.

## II. Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider

evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g).  Allen v. Colvin, No. CA 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir.1996)).  If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).

### III. **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.[6]  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

---

[6] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite to one set of regulations only.  See id.

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. 20 C.F.R. § 404.1520(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

## IV. Analysis

Social Security regulations establish the baseline proposition that, as non-treating state agency medical experts specializing in the diagnosis and treatment of mental health issues, all three of the opinion sources in this case (Drs. Baldwin, Killenberg and Gordon) were required to be evaluated by the ALJ in light of their "supportability" and "consistency" with the relevant medical evidence and were entitled to "more weight" based on their specialties in the diagnosis and treatment of mental health disorders. 20 C.F.R. § 404.1527; Ruiz-Gonzalez v. Comm'r of Soc. Sec., No. 13-cv-1524 (MEL), 2014 WL 6983383, at *5 (D.P.R. Dec. 10, 2014) ("with regard to both [s]tate agency medical consultants . . . and medical experts, . . . the ALJ is not

bound by their findings, but nonetheless must consider them"). Further, as the only one of the three who made and relied on actual observations of Plaintiff,[7] Dr. Baldwin's opinion is of a type that is "[g]enerally" worthy of "more weight" as coming from "a source who has examined you," by comparison with Drs. Killenberg and Gordon, who are sources "who ha[ve] not examined you." 20 C.F.R. § 404.1527(c)(1).

With this proposition framing the issues, the first problem with the ALJ's decision in this case is that many, if not most, of the reasons underpinning the conclusion that the Baldwin opinion "is not supported by the record" are tainted by error.[8] Tr. 28, 33.

For starters, the ALJ's foundational finding that the Baldwin opinion clashes with the treating record because "mental status examinations have generally been within normal limits," Tr. 32, ignores that all the MSEs performed by the most qualified treating source, psychiatrist Dr. Cermik, are seriously abnormal. They contain serious and troubling findings that Dr. Baldwin found to be consistent with Dr. Cermik's diagnosis of personality disorder. Similarly, the Amaral MSE performed after the amended onset date is troublingly abnormal, while her MSEs in the period leading up to the amended onset date reflect exacerbating symptoms. The ALJ's finding is accurate only as to the nonacceptable medical source, the social worker Ms. LaForge, whose MSEs are within normal limits; yet even she made abnormal findings by the last appointment.

---

[7] The Commissioner argues that the Court should ignore Dr. Baldwin's testimony that his medical opinion was based in part on his observations of Plaintiff's "presentation" during the hearing. The crux of this argument seems to be that the ALJ found Plaintiff lacking in credibility so Dr. Baldwin could not rely on his statements as true. That is beside the point – Dr. Baldwin clearly explained that he was relying on his observation of Plaintiff's presentation, not that he was accepting as true Plaintiff's words.

[8] The Commissioner points out, correctly, that an ALJ was not required to state "good reasons" for his evaluation of the opinions of non-examining medical sources as he would be for the opinions of treating sources. See, e.g., Cruz o/b/o Fonseca v. Colvin, C.A. No. 14-526ML, 2016 WL 1068860, at *11 (D.R.I. Feb. 18, 2016); Smythe v. Astrue, Civ. No. 10-251, 2011 WL 2580650, at *5 (D. Me. June 28, 2011). Here, however, this ALJ did give reasons; the issue is that they are not supported by substantial evidence.

Second, the ALJ relied heavily on Plaintiff's treatment noncompliance as a reason to ignore the Baldwin opinion. The error is exposed by Dr. Baldwin's testimony – he specifically noted that treatment noncompliance was a reason why he did not form the opinion that Plaintiff's PTSD met or equaled a Listing. Tr. 77. However, as to personality disorder, despite pervasive evidence of noncompliance, Dr. Baldwin's opinion was unequivocal that the 12.08 Listing criteria were met. Tr. 77-78. The ALJ asked Dr. Baldwin no questions about the medical significance of noncompliance for a claimant with a personality disorder, relying instead on his lay judgment. Notably, this aspect of the Baldwin opinion is consistent with numerous cases holding that, when noncompliance is a symptom of the diagnosed impairment, its presence supports, rather than undermines, a finding of disability. See, e.g., Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) (for claimant with personality disorder, "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse'") (alterations in original); Auchey v. Berryhill, Civil Action No. 15-30174-MGM, 2017 WL 4399542, at *4 (D. Mass. Sept. 29, 2017) ("court is also concerned that the ALJ has failed to consider whether medication noncompliance on Plaintiff's part was actually a symptom of his mental illness"). When an ALJ relies on lay assumptions about noncompliance to support pivotal findings regarding a claimant with such impairments as personality disorder, courts remand the matters for further consideration. E.g., Martinage v. Berryhill, Case No. 16-cv-245-PB, 2017 WL 1968291, at *10 (D.N.H. Apr. 20, 2017), adopted, 2017 WL 1968273 (D.N.H. May 11, 2017) (remanding for further consideration of medical evidence that personality disorder was reason for noncompliance with treatment to control diabetes); Marshall v. Astrue, No. 4:11CV00228-JTR, 2012 WL 182241, at *3 (E.D. Ark. Jan. 23, 2012) (remanding claim

based in part on personality disorder, where "mental symptoms were 'likely exacerbate[d]' by substance abuse and noncompliance with medication and medical appointments'").

Third, the ALJ is simply wrong in finding that treating records suggest Plaintiff reported that he was working "as late as July 2018." Tr. 33. In fact, the treating records from July 2018 consistently record that Plaintiff reported that he was "unable to work" and "unemployed." Tr. 651, 658. The ALJ's reference appears to come from a portion of Ms. LaForge's notes that replicate the text of the discharge summary, which itself was not based on information provided by Plaintiff. Tr. 658. Moreover, the foundation for the discharge summary was the topic of questioning of Plaintiff during the ALJ hearing, all which Dr. Baldwin observed and incorporated into his medical opinion.

Fourth, the ALJ relies on "minimal medication adjustments" and no hospitalizations. Tr. 33. Unlike some of the other reasons, both of these are factually supported by substantial evidence. However, the conclusion that they undermine or contradict the Baldwin opinion requires medical expertise outside the purview of the ALJ's (or the Court's) capacity. That is, for these facts to amount to substantial evidence that the Baldwin opinion is unsupported requires that it be medically likely that a person suffering from a personality disorder serious enough to meet the criteria for Listing 12.08 would have been hospitalized for an exacerbation of symptoms or would have required medication adjustments during the period in issue. See Rivera-Torres v. Sec'y of Health & Human Servs., 837 F.2d 4, 7 (1st Cir. 1988) (ALJ is lay fact finder who lacks expertise to make medical conclusions). Aware of both "minimal medication adjustments" and no hospitalizations, Dr. Baldwin nevertheless opined that Plaintiff's impairment met or equaled Listing 12.08; there is no competing medical opinion that the presence of minimal medication adjustments and no hospitalizations medically undermine Dr.

Baldwin's conclusion. Therefore, they fail as substantial evidence supporting the ALJ's finding that Dr. Baldwin's testimony is not supported by the evidence of record.

Finally, to the extent that he strays from reliance on the state agency opinions, the ALJ improperly substituted his lay judgment for Dr. Baldwin's expertise when he (the ALJ) based his B criterion finding regarding Plaintiff's capacity to understand remember and apply information in part on his observation that Plaintiff "had no difficulty answering questions at the hearing." Tr. 28. As noted, Dr. Baldwin made a medical judgment regarding the same B criterion based on his observation of Plaintiff's "presentation." That is, Dr. Baldwin observed Plaintiff and relied on his medical expertise in assessing Plaintiff's capacity to understand, remember and apply information; he found a marked impairment. The ALJ made the same observation, relied on his lay judgment and found the impairment to be only mild. The Court notes that the ALJ's finding strains credulity in that Plaintiff's ability to answer questions at the hearing was so limited that the ALJ twice appealed to his attorney for help in comprehending his answers and once had to ask Plaintiff to leave the room and call for security. Tr. 47, 51, 73-74.

The corollary to these errors is the ALJ's equally troubling determination to afford "great weight" to the state agency opinions from Drs. Killenberg and Gordon. The Commissioner appears to concede that it was error to place great weight on the opinion from Dr. Killenberg, who saw nothing from the period of alleged disability because the onset date was amended to a day over a month after she signed her opinion. However, the Commissioner doubles down on the opinion from Dr. Gordon, which was rendered less than two months after the new alleged onset date. Therefore, Dr. Gordon saw only one record from the period in issue; he saw none of the Providence Center records after June 21, 2017, including the Cermik notes establishing not only an additional abnormal MSE finding, but also the persistence of Plaintiff's symptoms over a

15

protracted period.  Nor did Dr. Gordon hear Plaintiff's testimony, such as his bizarre explanation for protracted noncompliance in failing to appear at and avoiding making appointments with Dr. Cermik.  Tr. 62 ("I think he tries to test me . . . to see if I'm going to argue with him, or jump him . . . .  I just felt like he was putting me down.").  The ALJ's reliance on Dr. Gordon is further undermined by the reality that, while Dr. Gordon may have seen more of Dr. Cermik's treating records than Dr. Killenberg saw, he essentially ignored them in that his opinion is largely a cut-and-paste from that of Dr. Killenberg.  Under such circumstances, I find that it was error for the ALJ to treat the Gordon opinion as substantial evidence and error to afford it great weight.  Virgen C. v. Berryhill, C.A. No. 16-480 WES, 2018 WL 4693954, at *3 (D.R.I. Sept. 30, 2018) ("if a state-agency physician reviews only a partial record, her 'opinion cannot provide substantial evidence to support [an] ALJ's residual functional capacity assessment if later evidence supports the claimant's limitations'").

To recap, the ALJ erred in rejecting Dr. Baldwin's opinion for reasons that lack the support of substantial evidence.  He also erred in affording great weight to the opinions of Drs. Killenberg and Gordon; they do not amount to substantial evidence because they were based on the review of the record from the period entirely (as to Dr. Killenberg) and largely (as to Dr. Gordon) prior to the period in issue in this case.  I recommend that the Court remand the matter for further consideration of these issues.

## V.    **Conclusion**

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 11) be GRANTED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be DENIED.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of

the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
March 2, 2020